J-A04007-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | | |
|---|---|---|---|
| J.H. | : | IN THE SUPERIOR COURT OF | |
| | : | PENNSYLVANIA | |
| | : | | |
| v. | : | | |
| | : | | |
| | : | | |
| | : | | |
| M.W. | : | | |
| | : | No. 1378 MDA 2024 | |
| Appellant | | | |

Appeal from the Order Entered September 19, 2024
In the Court of Common Pleas of Berks County Civil Division at No(s):
23 4892

BEFORE:  LAZARUS, P.J., NICHOLS, J., and SULLIVAN, J.

MEMORANDUM BY LAZARUS, P.J.:                    **FILED: MAY 2, 2025**

M.W. (Mother) appeals from the order, entered in the Court of Common Pleas of Berks County, granting J.H. (Father) sole legal and shared physical custody of the parties' minor daughter, A.W.-H. (Child) (born October 2020). After careful review, we reverse and remand with instructions.[1]

---

[1] The Domestic Violence Legal Empowerment and Appeals Project and the National Family Violence Law Center at George Washington University Law School have filed an amicus curiae brief supporting Mother's position on appeal that the trial court's reliance on parental alienation to support Father having sole legal custody—i.e., prohibiting Mother from obtaining any information about Child's health or education without Father's permission—prevented the court from objectively assessing the evidence, "drove its negative credibility determinations[, and] . . . violate[d] the clear mandate of Kayden's Law to meaningfully assess a parent's concerns about child safety."  **See** Amicus Curiae Brief, at i, 1.  In essence, the amicus brief challenges the theory of parental alienation on the bases that it is "subjective and unscientific."  **Id.** at 1.

*(Footnote Continued Next Page)*

Mother and Father were in a relationship from October 2019 through July 2021. The parties never married. Father is an aerospace engineer for the United States Department of Defense. Mother is the vice-president of an energy company located in Washington, D.C., and is also a remote-based adjunct professor at Farleigh Dickinson University. When Mother became pregnant with Child, she moved to Hughesville, Maryland, to live with Father. Child was born in Arlington, Virginia, in October 2020. The parties separated in August 2021. At that time, Mother relocated to Virginia and Father remained in Maryland.

In August 2021, Father filed a custody action in Maryland. On September 13, 2021, the parties executed a temporary parenting

_____

Kayden's Law refers to a Pennsylvania Senate Bill that amended section 5328(a) by introducing new language into subsection 5328(a)(8), concerning "the attempts of a party to turn the child against the other party, except in cases of abuse where reasonable safely measures are necessary to protect the health and safety of the child from harm." 23 Pa.C.S.A. § 5328(a)(8). The new language provides that one party's "reasonable concerns for a child's health and welfare and the party's reasonable efforts to protect the child shall not be considered attempts to turn the child against the other party."

The amicus brief avers that the trial court misapplied this custody factor by characterizing Mother's behavior as dishonest and classifying her actions as a "deliberate course of conduct designed to interfere with Father's relationship with [C]hild." Amicus Curiae Brief, at 21. However, the court apparently did not find Mother's concerns for the safety of the child, *vis à vis* Father's alleged abusive actions, reasonable. Although amicus believes that there is "no factual basis" for characterizing Mother's behavior as unreasonable, all reports of abuse by Father were deemed unfounded. In any event, the trial court explicitly states in its Pa.R.A.P. 1925(a) opinion that, while it did ask some questions regarding parental alienation during the custody trial, it "did not make any findings about parental alienation." Trial Court Opinion, at 10/16/24, at 61.

- 2 -

arrangement[2] granting Mother primary physical custody and Father partial, supervised[3] physical custody every weekend for two hours and every Monday for two hours. Maternal grandmother supervised Father's visits with Child. In May 2022, the parties executed another agreement, entered as a consent order, granting Father *un*supervised physical custody every other Friday through Sunday and every other Thursday.

In January 2023, the parties executed a third custody agreement providing for shared legal custody, giving Mother primary physical custody, and increasing Father's physical custody to every Wednesday overnight and every other Friday through Sunday (later extended through Monday).[4] Father also was granted overnight visits in the summer. Finally, both parties agreed to relocate to either Montgomery or Berks County, Pennsylvania. Father registered the January 2023 order in Berks County, where Mother and her extended family resided. Custody exchanges at that time occurred at the Exeter Police Department.

_____

[2] Per the agreement, maternal grandmother brought Child to Father's home on Monday afternoons for visitation. The agreement also permitted Father to meet Mother and Child at a mutually convenient location in Virigina for two hours on a weekend day.

[3] Mother testified that due to the deplorable condition of Father's house and the fact that he did not have a bedroom to accommodate Child overnight, the visits were ordered to be supervised. **See** N.T. Custody Trial, 9/9/24, at 258-59.

[4] That agreement was adopted by consent order in a Charles County, Maryland court. The order was later confirmed as a matter of law on June 22, 2023. **See** Trial Court Docket Entry, 6/22/23.

In May 2023, Father filed a contempt petition, in Berks County, alleging Mother's unilateral decision to enroll Child in preschool[5] without his consent violated the legal custody provisions of the January 2023 consent order. Following a contempt hearing, held in July 2023, the court denied Father's petition, permitting Child to enroll in preschool, but requiring Father be authorized to receive information regarding Child from the school and that he also be added as an emergency contact and someone who could pick up or drop off Child at school. *See* Order, 7/19/23.

In July 2023, Mother filed a protection from abuse (PFA)[6] order against Father, on behalf of Child, alleging that earlier that month Mother had taken Child to be examined by a physician for vaginal itching and changes in her behavior.[7] Mother believed Child was at risk in Father's care where Mother "suspect[ed] that there was inappropriate touching that has caused the infection and that is causing [C]hild's concerning behavior." Petition for Emergency Special Relief, 8/4/23, at ¶ 10. The physical examination confirmed that Child had some redness on the outside of her genitalia; Child tested negative for a urinary tract infection and sexually transmitted diseases.

---

[5] On May 13, 2023, Mother sent Father a message on the OurFamilyWizard application stating that she had enrolled Child at Lancaster County Day School and would pay Child's tuition.

[6] *See* 23 Pa.C.S.A. §§ 6101-6122.

[7] The doctor testified Mother brought Child to be examined because Child had "become very clingy, very irritable. She eats a lot upon arrival from transfer and pick up from [F]ather's side and she's having night terrors." N.T. PFA Hearing, 8/7/24, at 6.

Although a physician diagnosed Child with vulvovaginitis,[8] the doctor indicated that there were no other physical findings or signs of trauma/bruising/discharge.[9]  Ultimately, the physician determined that she could not render an opinion regarding whether Child had or had not been sexually abused, deeming the medical findings "inconclusive."  *See* N.T. PFA Hearing, 8/7/24, at 49 (Father testifying after CYS conducted interview and home inspection, investigation "closed" and report deemed "unfounded").  However, because the physician was a mandated reporter, she was required to file a report with Berks County Children and Youth Services (CYS), which initiated a child abuse investigation.  In July 2023, BCCYS completed its assessment and determined no further services were required.  *See* BCCYS Letter, 7/28/23 (Plaintiff's Exhibit 1).

While the PFA petition was pending, Mother filed an emergency petition for special relief requesting Father's custodial time be supervised pending the outcome of the PFA petition.  Mother also requested play therapy for Child. On August 7, 2023,[10] the court held a hearing on Mother's petitions.  At the hearing, Celerina Liawag, M.D., the pediatrician who examined Child based on Mother's concerns, testified that she diagnosed Child with an exterior vaginal

_____

[8] Child's pediatrician testified that vulvovaginitis is "very common in kids." *Id.* at 11.

[9] The physician prescribed a topical antibiotic that should be applied to Child's vaginal area by hand.

[10] The notes of testimony from the PFA hearing incorrectly list the date as August 7th, 202**4**.

infection (vulvovaginitis) due to redness observed during her physical examination in July 2024 and prescribed an antibacterial ointment to be applied by hand "by the mother to [the] affected area two times a day [for a] total of five days," to the exterior of Child's genitalia. N.T. PFA Hearing, 8/7/23, at 13. ***But see id.*** at 54-58 (Father testifying Mother told him about ointment needing to be applied to Child, but because she did not provide it upon transfer to his custody, he called Doctor Liawag and asked doctor if he could administer medication and how to apply it); ***see id.*** (Father testifying doctor told him she could not legally prevent parent from administering medication and that he picked up prescription and applied it to Child despite Mother telling him only she was to apply it). Doctor Liawag also testified that she told Mother to take Child to the emergency room "[b]ecause of [Mother's claim] of the change of her behavior during the transition and redness" as Dr. Liawag "did not have any swabs or anything that [she] c[ould] use to collect any specimen if needed." ***Id.*** at 8.

Doctor Liawag also testified that because she could not make a definitive finding regarding whether child had been abused, as a mandated reporter she lodged a report with BCCYS "several days later." ***Id.*** at 12. Child had a follow-up with Dr. Liawag at which time Mother reported that Child's behavioral concerns continued; however, Dr. Liawag testified that Child's behavior continued to be age-appropriate. ***Id.*** at 17 (doctor reporting Mother's concerns that Child returns from Father's visits "very, very, very hungry, clingy, [and] irritable").

Mother testified at the PFA hearing that Child began exhibiting behavioral concerns, consisting of outbursts and fear of Father upon returning from an overnight visit at Father's in July 2023. *Id.* at 22-23. Mother said the Child returned from her visit "dirty, hungry, [with] matted hair[,] smelling of body odor [and urine, and suffering from vaginal] itching" and that her vagina was red. *Id.* at 23. Mother also testified that Child told her "she was being pushed and hit [and] that she was frightened because she may never see [Mother] again because she was scared she was going to be killed." *Id. See also id.* at 30 (Mother testifying when Child returned from visit in December 2022 Child began having night terrors, was fearful, crying, and aggressive, had stomach aches, and would tell Mother that she had to keep secrets; negative behaviors began to get "more prevalent" recently).

The court ultimately denied Mother's PFA petition, but granted Mother's emergency petition, in part, ordering "that the parties obtain play therapy for [C]hild . . . at Thriveworks Counseling and Psychiatry in Wyomissing, Berks County[.]" Order, 8/8/23, at 1. The order further specified that **Mother and Father** "shall (i) immediately take all reasonable and necessary steps to obtain the requested therapy for [C]hild, (ii) follow all recommendations for treatment, and (iii) **fully and completely cooperate with each other in obtaining the therapy ordered**[.]" *Id.* (emphasis added). Child was to continue with play therapy until she was discharged or further order of court. *Id.*

On August 9, 2023, Father filed a petition to modify custody, specifically seeking shared physical custody. On October 5, 2023, Father filed a second contempt petition in which he alleged Mother had relocated to Lancaster County, Pennsylvania, without giving him notice, and that Mother scheduled play therapy for Child without including Father in the process or otherwise including Father in the sessions.[11] On December 20, 2023, Mother filed an answer with new matter and an amended counterclaim for special relief, to Father's contempt petition, requesting that Father's visitation be suspended or supervised "until a thorough investigation [of Child's safety with Father] can be completed." Mother's Answer to Father's Contempt Petition, 12/20/23, at ¶ 43.

On December 21, 2023, the court held a hearing on Mother's counterclaims.[12] Children and Youth Services Intake Caseworker Marie

---

[11] The court's September 19, 2024 decision and order states that it "anticipated play therapy would be jointly pursued by the parties." Decision and Order, 9/20/24, at 27, citing Order, 7/19/24. To be clear, the court's play therapy order states that *both* parties shall "take all reasonable and necessary steps to obtain the requested therapy" and that both Mother *and* Father "shall fully and completely cooperate with each other in obtaining the therapy ordered." Order, 8/8/23. Notably, the court stated in its decision that it did not know whether Father's lack of participation in Child's play therapy sessions was due to his own volition, was a product of Mother's controlling behavior, or a combination of the two.

[12] Due to the fact that a criminal investigation was pending regarding allegations that Father was abusing Child, the court decided to continue the hearing on Father's second contempt petition. *See* N.T. Hearing, 12/21/23, at 4-5.

Rossignoli, play therapist Moriarty-Puggi, and Mother testified at the hearing. Rossignoli testified that, based upon a report that Child was being sexually abused by Father, she conducted a 20-25 minute "minimal fact interview" of Child during which Child told the caseworker that "Daddy touched her" and then pointed to the area of a vagina on a body parts drawing. N.T. Hearing, 12/21/23, at 9. Based on that interview, the caseworker made a referral for a forensic interview to the Children's Alliance Center. *Id.* at 11. Rossignoli expressed that CYS had safety concerns regarding Child having unsupervised contact with Father. *Id.*

Moriarty-Puggi testified that she has been treating Child since August 2023, and, at the time of the hearing, had held approximately 15 play therapy sessions with Child. She also testified that in mid-October 2023, she diagnosed Child with anxiety and Post-Traumatic Stress Disorder (PTSD-unspecified) "[b]ased off of her symptoms [i]n her play and [because she] me[t] the criteria[.]" *Id.* at 23-24. In particular, Moriarty-Puggi testified Child would cry, scream, and constantly run around during sessions, particularly when she was talking about Father. *Id.* at 24. The therapist also testified that Child's behavior is dramatically different after she comes back from a visit with Father (quiet/shuts down) versus when she sees her after Child has been at Mother's (vocal and playful). *Id.* at 25-26. Moriarty-Puggi also testified that Child revealed things in session—such as Father is mean, hits her on her "bum bum," smacks her on her head, and pokes her cheek— warranting Moriarty-Puggi, a mandated reporter, to call Child Line. *Id.* at 26.

Most critically, Moriarty-Puggi testified that Child told her Father had touched her "there" and used the word "wiggle." *Id.* Child was unable to explain this word any further. *Id.* at 27. Moriarty-Puggi testified that she had had about 50 phone calls with Father and over 80 emails with him since Child started play therapy. *Id.* The therapist testified that she has apprised both Mother and Father about what has been happening with Child in sessions and noted that she has only ever seen Child in person with Mother. *Id.* at 28. Finally, Moriarty-Puggi testified that she believed, within a reasonable degree of medical certainty, that Child's PTSD was due to a form of abuse underlying the trauma and that, in her professional opinion, Child has been sexually abused. *Id.* at 36.

At the conclusion of the hearing, the trial court expressed, on the record, that it was not convinced that Child was being sexually abused, but, in an abundance of caution, entered an interim custody order that suspended Father's visitation rights under the May 2023 consent order, pending further order of court,[13] and also ordered that Child continue with play therapy with a new, independent psychologist, other than one at Thriveworks, who has

---

[13] The court order permitted Father to have supervised visits in a public place with Child. However, he decided not to exercise that right, stating "I thought that this time it would be better if I just remain out of the picture because every time I have a visit, they continually get subjected to forensic interviews, medical exams . . . STD testings, all in an attempt to take her away from me." N.T. Hearing, 5/8/24, at 21.

- 10 -

experience with parental alienation.[14] *Id.* at 50-51; *see also* Interim Custody Order, 12/21/23, at 1-2. The hearing on Father's second contempt petition was continued.

In February 2024, the court entered an order requiring Child to submit to a psychological evaluation, performed by the Joseph J. Peters Institute (the Institute) in Philadelphia, to determine the appropriate treatment for Child based on a determination of whether Child has been the victim of physical or sexual abuse and/or parental alienation. Order, 2/7/24, at 1. On February 29, 2024, psychologists from the Institute sent Mother a letter indicating their "immediate safety and treatment recommendations" regarding Child, and also stating that a comprehensive evaluation report, which would include a final recommendation, would be completed within one month. *See* Institute Letter, 2/29/24. The Institute diagnosed Child with PTSD and recommended weekly one-hour individual therapy sessions for Child until she has completed 80% of her treatment protocol and her PTSD symptoms have significantly reduced. Notably, Mother scheduled Child's evaluation at the Institute, providing the Institute psychiatrists and psychologists with a letter from Moriarty-Puggi that the doctors reviewed.

On February 29, 2024, Father filed a petition for special relief to modify the interim custody order and resume Father's visitation. On May 8, 2024,

---

[14] On February 15, 2024, CYS caseworker Rossignoli sent Father a letter indicating that another report of suspected child abuse that had been lodged against him with regard to Child on December 19, 2023, was deemed "unfounded." *See* BCCYS Letter, 2/15/24 (Plaintiff's Exhibit 3).

the court held a hearing on Father's petition. Father testified that he was never contacted or interviewed by anyone from the Institute relating to the evaluation conducted on Child. *See* N.T. Hearing, 5/8/24, at 19. At the conclusion of Father's testimony, the court continued the matter, so that a psychiatrist from the Institute could testify regarding its evaluation of Child. On July 9, 2024, the court held the continued hearing on Father's petition; Moriarty-Puggi, Institute forensic psychologist Julia Curcio-Alexander, Ph.D., and Mother testified at the hearing. While Moriarty-Puggi testified that, based on Child's regressive behaviors and comments during sessions, "there's questionable sexual abuse," the therapist also testified that she did *not* have an opinion within a reasonable degree of professional certainty as to whether Child has been sexually abused, but diagnosed Child with PTSD and anxiety related to trauma and physical abuse, noting that "[F]ather is connected to her trauma." N.T. Hearing, 7/9/24, at 16, 30, 41. Finally, Moriarty-Puggi testified that she would suggest no contact with Father while Child continues to heal and become stable with play therapy, and then, "[a]t some point, family reunification therapy would be[ beneficial]." *Id.* at 21-23.

Doctor Curcio-Alexander testified that she supervised Child's psychological examination in February 2024; the primary evaluator was Dr. Kenneth Cruz. The doctors' job was "to look for and find a diagnosis based on what was reported to [them] and what [C]hild's symptoms are[.]" *Id.* at 77. Prior to completing the evaluation, psychologists at the Institute reviewed Child's health history, a symptom checklist, a trauma screen, a family

strengths and stress questionnaire, and intake information that had been filled out by Mother that specifically delineated what Child's trauma exposures were. *Id.* at 56-58. Doctor Curcio-Alexander testified that while Mother accompanied Child and provided information about Child's health, development, and symptoms, Father did not participate at all in the Institute's evaluation. *Id.* at 58. Doctor Curcio-Alexander specifically testified that when there is a conflict situation between parents, the Institute does not have both parties present but gives the non-participating parent the opportunity "to reach out to [Dr. Curcio-Alexander] or someone else in the clinic and ask for an appointment so that their input can be part of the evaluation." *Id.* Father did not contact the Institute to participate in the process.

Doctor Curcio-Alexander testified that the theory of parental alienation is not supported by evidence, has not been accepted in the psychological community, and introduces a significant bias against women and children in family court proceedings. *See* N.T. Hearing, 7/9/24, at 69-70. Ultimately, the team of professionals at the Institute diagnosed Child with PTSD, *id.* at 61, and recommended Child continue her play therapy at Thriveworks, participate in trauma-support care, have no contact with Father (alleged abuser), and only reunify with Father once he successfully completes sex-offender therapy. *See* Defendant's Exhibit 6, at 10.

Following the two custody hearings held in May and July 2024, the court vacated its December 2023 order, reinstituted Father's visitation rights,

granted Father partial supervised[15] physical custody, and denied Mother's request to reinstate Child's play therapy at Thriveworks after determining that the therapist "ha[d] lost the independent perspective and objectivity necessary to help [C]hild." Trial Court Decision and Order, 7/22/24, at 3 n.1. The court also found the therapist to be "hostile, combative[,] and argumentative while testifying." *Id.* Ultimately, the court determined that the therapist "poses a risk to [C]hild" because she made recommendations beyond the scope of her assignment that were based upon one-sided credibility determinations about Mother's statements leading her to conclude that Mother was a "domestic abuse survivor." *See* N.T. PFA Hearing, 9/7/23, at 10 (pediatrician testifying she "encourage[d] Mother that if she is scared [of Father,] that she should protect herself").

In September 2024, the trial court held a two-day custody trial where Mother, Father, CYS caseworker Rossignoli, and Child First Family Services Supervisor Facilitator Lauren Mateyka testified. Caseworker Rossignoli testified that CYS had received two reports of abuse (one sexual and one physical) with regard to Father as it related to Child. Following a thorough investigation, both reports were ultimately deemed unfounded. *See* N.T. Custody Trial, 9/6/24, at 18-23.

---

[15] The court explained during the custody trial that it imposed supervised visitation, at Mother's request, not due to the allegations of abuse lodged against Father, but because he had not had visits with Child in almost eight months. *See* N.T. Custody Trial, 9/6/24, at 105.

Mateyka testified that from July 2024 to September 2024, she supervised thirteen visits between Father and Child.[16]  *Id.* at 36.  Mateyka testified that, despite a difficult transfer from Mother to Father at the first visit in July 2024, Child eventually "warm[ed] up to Father."  *Id.* at 41.  *See also id.* at 57 (Child, unprompted, telling Father during third supervised visit with Mateyka, "dada, I love you").  Mateyka also testified that she did not have any concerns about Child's safety or well-being based on Father's behavior during any of the visits.  *Id.* at 42, 74, 141-42.  Mateyka testified that, as the sessions progressed and Child gradually warmed up to Father, "there was just appropriate interaction between a father and a child."  *Id.* at 47.  *See also id.* at 51-52 (Mateyka testifying no interactions during visits led her to believe Father had abused Child in past and that all interactions were "normal . . . for a loving father-daughter relationship"); *id.* at 55 (no concerns with Father helping Child in bathroom during visits); *id.* at 58 (dad was comforting, supportive, and encouraging after Child skinned knee while running during visit).  Mateyka testified that, in her opinion, Father loves and cares for Child, that Child cares for, respects, and loves Father.  *Id.* at 88.  Finally, Mateyka did not see any reason that Father's visits should be supervised.  *Id.*; *id.* at 134 (Mateyka testifying on re-direct examination "[t]here [were] no abnormal or safety concerns").

---

[16] At this time, Father had supervised visits for two hours every Wednesday and for six hours every Sunday.  *Id.* at 89.

Although Mateyka testified her job was to "supervise dad and the minor child," she pointed out to the court that during exchanges, Mother's body language and behaviors during those transitions are "very noticeable." *Id.* at 118. In particular, Mateyka noticed Mother's "pressured speech, her shaking, her hesitancy." *Id. See also id.* at 138 (Mateyka testifying maternal grandmother was also "cold and distant" during transitions).

Father testified that until the parties separated in August 2021, they shared childrearing responsibilities. Father testified he took paternity leave "initially, to care for [Child]." *Id.* at 149. Once the parties separated, Father testified Mother made things difficult for him. *See id.* at 153 (Father testifying Mother would not give Father picture of Child's birth certificate for insurance purposes); *id.* at 154-56 (Father testifying Mother "relocated multiple times" without first letting him know she had moved or planned to move); *id.* at 161-62 (Father testifying he objected to preschool in which Mother ultimately enrolled Child and did not tell Father before she did so). *But see id.* at 162-42, 205 (Father testifying Mother has informed Father about some of Child's scheduled doctor and dentist appointments and soccer events, but that she "usually unilaterally decides the activities" for Child).

Mother testified that when she moved in with Father when she was pregnant with Child, Father's personality changed. Specifically, she testified she was forced to follow his "very stringent rules," which included not being allowed to watch TV in the upstairs bedroom, not talking during dinner, only being permitted to watch TV programs he approved of, not allowing Mother to

get up to use the bathroom during the night because he did not want to have his sleep interrupted, and not permitting Mother to go outside without first asking for his permission and, that, after Child was born, Father became even "more controlling." *Id.* at 231-32, 236. Mother also testified, contrary to Father, that Father only took care of Child as an infant from 1:00 am to 7:00 am and that if she or maternal grandmother did not relieve him promptly at 7:00 am, he would tell them that they were "being disrespectful and disrespecting his time." *Id.* at 234. *See also id.* at 325 (Mother testifying she does "[e]verything" for Child on day-to-day basis, including feeding her, clothing her, taking her to school, paying for school, taking her to activities, and doing her laundry). Mother testified that she was the sole party that scheduled Child's doctor and dental appointments and enrolled her in activities (swimming and other classes) and preschool. *Id.* at 336-37.

Mother also testified that Father's Maryland home was "disgusting." *Id.* at 246. In particular, she testified that the home, which she lived in while she was pregnant with Child and after Child was first born, had dog urine and feces all over it, that "he would leave dog pee all over the rug and then later cover it with baking soda piles that would then sit there for weeks until [she or he would] vacuum it[.]" *Id.* at 246-47. Mother also testified that Father's house had a mice infestation and that he placed traps throughout the home. *Id.* at 247; *see also id.* at 249 (defense entering photographs as exhibits to support Mother's testimony of condition of Father's Maryland home). On July 31, 2021, Mother left Father's home with Child and moved in with maternal

- 17 -

grandmother in Alexandria, Virginia; at that time, Mother told Father that he was "welcome to see [Child] every day if [he] want[ed to]." *Id.* at 253-56. "One or two days after" Mother moved out of Father's home, Father filed for custody of Child. *Id.* at 257. Six months later, without telling Father, Mother purchased a condominium, for her and Child, "five minutes down the road" from maternal grandmother. *Id.* at 259. Mother testified that "[n]ot too long after[]" she moved into the condo, she "started seeing [Father] driving around the neighborhood." *Id.* at 260. Eventually, the parties agreed to move to Berks County. *Id.* at 264, 268.

Mother testified that Child's transitions to Father's custody during his visitation times "were very difficult." *Id.* at 269. Child would often "cry and scream" and Mother testified that custody exchanges often "took a minimum of 45 minutes to an hour plus." *Id.* at 269-70. Mother testified that Child would cry, have an upset stomach, and say she didn't want to go to Father's house for visits. *Id.* at 271. Mother also testified that, upon her return from visits with Father, Child's "demeanor was different," she would have night terrors, bouts of diarrhea, urinate in her pants, and "eat very ravenously." *Id.* at 272, 288. *See also id.* at 283 (Mother testifying Child would return from visits with Father acting "very lethargic, tired, sucking her fingers"). When Child would FaceTime with Mother while at Father's, Mother testified Child "would be crying on the phone . . . asking to come home" and that Mother would "try to do anything to comfort her." *Id.* at 285-86. Mother also testified that Child frequently would come home from her visits with Father

with unexplained bruises on her legs, arms, and back. *Id.* at 296-97, 304. Mother testified that Father never told Mother ahead of time when he was introducing highly allergic foods like peanuts and fish, despite the fact that Mother was highly allergic to those foods and the pediatrician had told parents that only one allergy food should be introduced at one time. *Id.* at 308-10.

In its decision, the trial court found that between July 2024 and the parties' custody trial, "Father had multiple supervised visits with [C]hild . . . [and that Father and Child] have exhibited a caring, loving[,] and bo[]nded relationship." Trial Court Decision and Order, 9/19/24, at ¶ 66-68. The court also determined that, as of the time of the custody trial, both Mother and Father had homes "that are suitable to safely and securely raise [C]hild." *Id.* at ¶ 73. The court also concluded, based upon the testimony of Child's psychologist and play therapist, that Child "may be currently suffering from [PTSD]," despite no traumatic event being identified as the cause. *Id.* at ¶ 74. *But see* N.T. Custody Trial, 9/9/24, at 418 (court stating it "already rejected" testimony that Child had been diagnosed with PTSD).

While the court did not find Mother poses a *physical* threat of harm to Child, it did conclude that "Mother . . . **may pose an emotional threat to [C]hild**" based on impaired decision-making due to her "immense dislike of Father[.]" Trial Court Decision and Order, 9/20/24, at 22 (emphasis added). *See also id.* (court stating Mother "**may have emotionally abused [C]hild in the past, is doing so presently[,] and could do so in the future.**") (emphasis added); *id.* at 28 (court stating, "Mother's conduct will not be adequate for []

Child's emotional needs."). Despite this finding, the court concluded that "both parties will attempt to ensure the safety of [C]hild[, albeit] Father will do slightly better than Mother." *Id.* Moreover, the court attributed fault to both parties for the level of conflict and lack of cooperation. *See* Memorandum Opinion, 10/16/24, at 54. Relying heavily on credibility determinations, the court analyzed each of the statutory custody factors, *see* 23 Pa.C.S.A. § 5328(a), to reach its ultimate custody decision.[17] *See E.D. v. M.P.*, 33 A.3d 73, 79-80 (Pa. Super. 2011).

_____

[17] Section 5328 provides:

> **(a) Factors.** In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving substantial weighted consideration to the factors specified under paragraphs (1), (2), (2.1), and (2.2)[,] which affect the safety of the child, including the following:
>
>> (1) Which party is more likely to ensure the safety of the child.
>>
>> (2) The present and past abuse committed by a party or member of the party's household, which may include past or current protection from abuse or sexual violence protection orders where there has been a finding of abuse.
>>
>> (2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).
>>
>> (2.2) Violent or assaultive behavior committed by a party.
>>
>> (2.3) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party if contact is consistent with the safety needs of the child.

*(Footnote Continued Next Page)*

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life[,] and community life, except if changes are necessary to protect the safety of the child or a party.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's developmental stage, maturity[,] and judgment.

(8) The attempts of a party to turn the child against the other party, except in cases of abuse where reasonable safety measures are necessary to protect the safety of the child. A party's reasonable concerns for the safety of the child and the party's reasonable efforts to protect the child shall not be considered attempts to turn the child against the other party. A child's deficient or negative relationship with a party shall not be presumed to be caused by the other party.

(9) Which party is more likely to maintain a loving, stable, consistent[,] and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational[,] and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child or self from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

*(Footnote Continued Next Page)*

With regard to which party would encourage frequent contact between Child and parent, 23 Pa.C.S.A. § 5328(a)(1), the court found that this factor "favors Father and does not favor Mother" where Mother uses power struggle tactics against Father and "demonstrate[es] a desire for control." Trial Court Decision and Order, 9/19/24, at 24. Based on the Mother's behaviors, the court concluded that "Mother will not encourage [C]hild to have an ongoing relationship with Father unless it is under [her] terms [and that] Mother will

---

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S.A. §§ 5328(a)(1)-(16). Moreover, under subsections 5328(a.1) and (a.2):

**(a.1) Exception. A factor under subsection (a) shall not be adversely weighed against a party if the circumstances related to the factor were in response to abuse or necessary to protect the child or the abused party from harm and the party alleging abuse does not pose a risk to the safety of the child at the time of the custody hearing.** Temporary housing instability as a result of abuse shall not be considered against the party alleging abuse.

**(a.2) Determination.** No single factor under subsection (a) shall by itself be determinative in the awarding of custody. The court shall examine the totality of the circumstances, giving weighted consideration to the factors that affect the safety of the child, when issuing a custody order that is in the best interest of the child.

*Id.* at §§ 5328(a.1)-(a.2) (emphasis in original and added).

withhold [C]hild from Father if doing so serves [her] purposes." *Id.* The court also found that Mother's actions created instability and a lack of continuity in Child's life in large part due to her efforts to "interfere with Father's custody and his relationship with [Child]." *Id.* Based upon these findings, the court chose to gradually increase the time Child spends with Father. *Id.* at 25.[18]

Perhaps the custody factor weighing the heaviest against Mother was section 5328(a)(8)—attempts of a party to turn the child against the other party. Here, the court concluded that Mother "assert[ed] control over the custody of [C]hild . . . virtually [from] the moment the parties separated." *Id.* at 26. The trial court gave the following examples of Mother's control over the custodial situation: (1) Mother taking Child with her when the parties separated; (2) Mother dictating the terms under which Father could visit Child, including having Father's visits supervised by Maternal Grandmother; (3) relocating with Child without a "credible explanation;" (4) finding fault with almost everything Father did in relation to Child; (5) making an unfounded allegation that Father sexually abused Child; (6) inappropriately influencing Child's play therapist and a therapist from the Institute; and (7) attempting to influence Father's third-party visitation supervisor. *Id.* The court qualified its section 5328(a)(8) finding, however, by stating that due to Child's young

---

[18] Notably, because Child was under the age of five at the time of the custody trial, the court did not believe Child was capable of forming a parental preference. *See id.* at 25; 23 Pa.C.S.A. § 5328(a)(7).

J-A04007-25

age, it "was unable to determine what Mother has said or continues to say to [C]hild." **Id.**

On September 19, 2024, the trial court entered the instant custody order granting the parties shared, **unsupervised** physical custody[19] of Child and giving Father sole legal custody[20] of Child. With regard to Father's periods of physical custody, the court ordered the following: (1) from 9/19/24 through 12/1/24, Father had unsupervised custody of Child on Wednesdays from 4:00 p.m. until 7:00 p.m. and every Sunday from 9:00 a.m. until 6:00 p.m.; (2) from 12/4/24 through 1/31/25, Father had unsupervised custody of Child on

---

[19] The court specifically asked Father and Mother what their expectations were with regard to the court's final custody order. Father stated that he would "like a shared custody agreement between [himself and Mother]." N.T. Custody Trial, 9/9/24, at 211. However, Father recognized that a short "reunification time may be advisable" before the parties can achieve a 50/50 physical custody split. **Id.** Fearing future abuse allegations lodged against him, Father said he thought "supervised transitions would be beneficial for the period of just transitioning [C]hild for a short period of time[,] like six months." **Id.** at 211. Father also stated that he believed shared legal custody would be warranted. **Id.**

Mother expressed her wish that the court order Father have "supervised visitation to be extended and then go into gradual increase[s] in time []to overnights, eventually[.]" N.T. Custody Trial, 9/9/24, at 377; **see also id.** at 378 (Mother testifying she does not believe 50/50 physical custody split in Child's best interest "as of right now"). Mother testified that after six weeks to two months, if she is assured that Child is safe in Father's care, then the visits can progress to unsupervised and overnights. **See** N.T. Custody Trial, 9/9/24, at 395.

[20] "Legal custody" is defined under the Child Custody Act as, "[t]he right to make major decisions on behalf of the child, including, but not limited to, medical, religious[,] and educational decisions." 23 Pa.C.S.A. § 5322(a).

- 24 -

Wednesdays from 4:00 p.m. until 7:00 p.m. and on alternating weekends, beginning on December 6, 2024, from Friday at 6:00 p.m. until Sunday at 6: p.m.; (3) after 2/1/25, Father had unsupervised, shared physical custody alternating every other week on Monday and Tuesday, Friday, Saturday and Sunday with custodial exchanges taking place at 6:00 p.m. *See* Physical Custody Order, 9/19/24, at 3-4.

The legal custody portion of the order gives Father:

[The exclusive] right to make major decisions on behalf of and in the best interest of [C]hild including, but not limited to, medical, religious[,] and educational decisions. Father shall keep [Mother] informed of all major events and decisions impacting [Child's] life[.] For the purposes of th[e o]rder, the phrase "major events and decisions impacting [Child's] life," shall be defined to mean events and decisions that are important, serious[,] and significant to the degree that they may impact the general well-being and overall health of [C]hild. Further, Father may, in his sole and exclusive judgment, seek and solicit the input of Mother[;] however he is not required to do so. Regardless of whether Father seeks and solicits the input of Mother, all matters relating, but not limited to, medical, religious[,] and educational decisions impacting [C]hild are expressly and exclusively reserved to Father.

Final Custody Order, 9/19/24, at 1-2. The court's legal custody order "**EXPRESSLY PROHIBITED**" Mother from:

b. [E]xercising any legal custody rights involving [C]hild without the express written consent of Father or approval of this [c]ourt. This prohibition shall include, but not be limited to, the following: (i) Mother is prohibited from scheduling, attending[,] or taking [C]hild to medical, dental, or psychological appointments without Father's express consent; (ii) Mother is prohibited from communicating in any way with [C]hild's medical, dental, or psychological providers without Father's express consent; (iii) Mother is prohibited from listening in by telephone or any other electronic means upon medical, dental, or psychological appointments with [C]hild without Father's express consent; (iv)

> **Mother is prohibited from accessing any electronic portal for the purposes of viewing medical, dental, or psychological records of [C]hild** or otherwise communicating with [C]hild's medical, dental, or psychological providers without Father's express consent; (v) Mother is prohibited from communicating with school officials, school employees, teachers or extracurricular coaches, advisors[,] or directors, at any school [C]hild attends without Father's express consent; (vi) Mother is prohibited from listening in by telephone or any other electronic means upon conferences that Father has with [C]hild's teachers, extracurricular coaches, principals, tutors, or other educational providers without Father's express consent; (vii) **Mother is prohibited from accessing any electronic portal for the purposes of viewing educational records of** [**C**]**hild** or otherwise communicating with [C]hild's teachers, coaches, principals, tutors, or other educational providers without Father's express consent; and (viii) Mother is prohibited from executing or signing any waivers of liability, releases[,] or authorizations of any type for [C]hild.

Final Custody Order, 9/19/24, at 2-3 (emphasis in original and added).[21]

Mother filed a timely notice of appeal[22] and court-ordered Pa.R.A.P.

_____

[21] Finally, in the case of extreme medical emergencies, the court permitted Mother "to take [C]hild for, and to authorize, medical treatment." **Id.** at 3. The court defined "extreme medical emergency" as "a medical condition or injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." **Id.** Medical appointments, physicals, check-ups, and routine visits to doctors were not considered "extreme medical emergencies." **Id.**

[22] On September 20, 2024, Mother filed an emergency motion to stay the court's custody order pending appeal. **See** Pa.R.A.P. 1732. On September 30, 2024, the trial court held a hearing on Mother's motion and, on October 1, 2024, the trial court denied the stay, stating in its order that it will not "stay the implementation of the Final Custody Order based upon [Mother's] continued unsubstantiated allegations." Order, 10/1/24, at 1.

1925(b) concise statement of errors complained of on appeal.[23]  On appeal,

Mother presents the following issues for our consideration:

(1)    Whether the trial court abused its discretion in analyzing the custody factors in [section] 5328(a) and awarding Father sole legal and shared physical custody, when the findings are unreasonable, unsupported by the record, and/or there was a capricious disbelief of evidence[?]

(2)    Whether the trial court abused its discretion by adversely weighing the custody factors in [section] 5328(a) against Mother in violation of [section] 5328(a.1)[?]

(3)    Whether the trial court abused its discretion in qualifying Lauren Mateyka as an expert and relying on her testimony in fashioning the custody order[?]

(4)    Whether the trial court abused its discretion in discounting expert testimony based upon its belief that Mother turned independent third parties against Father and alienated Father, which is unsupported by the record[?]

(5)    Whether the trial court abused its discretion by displaying bias against Mother and issuing a custody order that is manifestly unreasonable, unnecessarily punitive, and beyond the relief requested[?]

---

[23] On September 27, 2024, without leave of court, Mother filed an amended Rule 1925(b) statement listing six more issues and twelve additional sub-issues.  The trial court devotes a lengthy footnote to this fact, acknowledging that "it had [already] spent considerable time preparing [its] opinion" and chastised Mother for her apparent "deliberate attempt to overwhelm [the c]ourt in an elaborate, legal conundrum."  Trial Court Memorandum Opinion, 10/16/24, at 8 n.3.  In any event, we will confine our review to those specific issues Mother has preserved by raising them in her original Rule 1925(b) statement and appellate brief.  *See* Pa.R.A.P. 1925(b)(4)(vii); *see also id.* at (b)(2)(i) ("**Upon application of the appellant and for good cause shown**, the judge **may . . . permit** an amended or supplemental Statement to be filed.") (emphasis added).

Mother's Brief, at 12.[24]

"Our paramount concern in child custody cases is the best interest of the child." **M.A.T. v. G.S.T.**, 989 A.2d 11, 19 n.9 (Pa. Super. 2010) (en banc) (citation omitted). Our standard of review of custody matters is as follows:

> In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law[] or are unreasonable in light of the sustainable findings of the trial court.

**C.R.F. v. S.E.F.**, 45 A.3d 441, 443 (Pa. Super. 2012) (citation omitted).

Moreover,

> [T]he discretion that a trial court employs in custody matters should be accorded the utmost respect, given the special nature of the proceeding and the lasting impact the result will have on the lives of the parties concerned. Indeed, the knowledge gained by a trial court in observing witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record.

**Ketterer v. Seifert**, 902 A.2d 533, 540 (Pa. Super. 2006) (citation omitted).

Moreover, "[i]t is within the trial court's purview as the finder of fact to

---

[24] Mother withdrew her claim that the trial court abused its discretion by prohibiting the parties from amending or modifying the custody order as doing so violates the constitutional right to parent. **See** Mother's Brief, at 71.

determine which factors are most salient and critical in each particular case."

***M.J.M. v. M.L.G.***, 63 A.3d 331, 339 (Pa. Super. 2013) (citation omitted).

Finally,

> [a]lthough we are given a broad power of review, we are constrained by an abuse of discretion standard when evaluating the court's order. An abuse of discretion is not merely an error of judgment, but if the court's judgment is manifestly unreasonable as shown by the evidence of record, discretion is abused. An abuse of discretion is also made out where it appears from a review of the record that there is no evidence to support the court's findings or that there is a capricious disbelief of evidence.

***M.A.T.***, 989 A.2d at 18-19 (citations omitted).

Mother claims that the trial court abused its discretion when it incorrectly "adversely weighed" the custody factors and determined that Father should have sole legal custody and partial physical custody of Child. Mother's Brief, at 12. Specifically, Mother contends that court's findings are unsupported and unreasonable and are indicative of the court's bias against her. ***Id.***

During trial, the trial judge specifically asked Father and Mother what their expectations were with regard to a final custody order. Father stated that he would "like a shared custody agreement between [himself and Mother]." N.T. Custody Trial, 9/9/24, at 211. However, Father recognized that a short "reunification time may be advisable" before the parties can achieve a 50/50 physical custody split. ***Id.*** Fearing future abuse allegations might be lodged against him, Father said he thought "supervised transitions would be beneficial for the period of just transitioning [C]hild for a short period of time[,] like six months." ***Id.*** at 211. Father also stated that in an effort to

foster better communication between the parties and promote the "shar[ing of] relevant information for our daughter," he was agreeable to do co-parenting counseling with Mother using the current court-appointed company that is conducting his supervised visits. *Id.* Finally, Father stated that he believed shared legal custody would be warranted, acknowledging that it means that both Mother and Father would have authority to make decisions that impact Child's life. *Id.*

Mother expressed her wish that the court order "supervised visitation to be extended and then go into gradual increase in time []to overnights, eventually[.]" N.T. Custody Trial, 9/9/24, at 377; *see also id.* at 378 (Mother testifying she does not believe 50/50 physical custody split in Child's best interest "as of right now"). Mother testified that after six weeks to two months, if Child has been determined to be safe in Father's care, then the visits can progress to unsupervised and overnights. *See* N.T. Custody Trial, 9/9/24, at 395. Mother also believed that Child should resume play therapy to address her PTSD, "so she can heal and move on with her life." *Id.* at 322. With regard to legal custody, Mother testified that she wanted the parties to have shared legal custody, but "would also like to have tiebreaking authority 'in emergency situations' based [on] the fact that it's so difficult to even get her to a doctor" with the opposition Mother gets from Father to try to agree on Child's providers. *Id.* at 341-42.

Notably, the "parties cannot dictate the amount of weight the trial court places on evidence." *A.V. v. S.T.*, 87 A.3d 818, 820 (Pa. Super. 2014)

(citation omitted). Moreover, as a reviewing court, we defer to the trial court's credibility findings—which necessarily involve weighing the demeanor of the parties and witnesses in coming to its ultimate custody decision. Here, the trial judge has presided over the parties' proceedings since May of 2023, including not only a custody trial, but also PFA and contempt hearings. Based on the numerous times the trial judge has seen the witnesses first-hand, the court made significant credibility determinations that ultimately drove its final custody order. **See** Trial Court Memorandum Opinion, 10/16/24, at 1 (court acknowledging it "rel[ied] extensively on" credibility determinations in coming to custody determination); **see also** Trial Court Decision and Order, 9/19/24, at 13-21 (court finding Father, Visit Supervisor Lauren Mateyka, and pediatrician, Celerina Liwag, MD, credible, but finding Mother, Play Therapist Marie Moriarty-Puggi, MA, and Psychologist Julia Curcio-Alexander, Ph.D, incredible). In making its credibility findings, the court outright rejected Mother's "repeated allegations of abuse to herself and [C]hild in this case" and believed that Mother's rendition of "life [while living] with Father [in Maryland] was not accurate." **Id.** at 19; Trial Court Decision and Order Denying Stay, 10/1/24, at 10, 13. In giving little to no credit to the professional conclusions of Moriarty-Puggi[25] and Dr. Curcio-Alexander, the court found that the therapist and psychologist relied extensively and almost exclusively on

---

[25] According to the court, Moriarty-Puggi also suggested Mother seek therapy as a domestic abuse survivor, yet the court found no basis for a conclusion that Father had abused Mother.

information provided by Mother and "did not receive or seek any information from Father." Trial Court Decision and Order, 9/19/24, at 21.

Additionally, our review of the record confirms that the court painstakingly analyzed and weighed each of the section 5328(a) custody factors based on the individualized facts of the case. *See supra* at 21-32. Notably, the court made the following credibility determinations as to Mother:

Turning to Mother, through a combination of what she said [at the custody trial], how she said it, and her general demeanor in the courtroom, the [c]ourt is of the opinion that Mother's credibility was highly suspect. In the absence of corroborating evidence, the [c]ourt is unable to give significant weight to her testimony.

From the perspective of demeanor, Mother presented very differently than Father. Observing Mother in the courtroom while other witnesses testified, she appeared to be angry and tense. Mother's anger rarely appeared to ease or lessen. She sat at counsel's table scowling with her lips pursed. She actively scribbled notes throughout the proceedings and would occasionally shake her head in disagreement with the testimony of other witnesses, even on matters of minimal importance or impact. Whereas Father's headshaking appeared to be the result of disbelief as to what Mother was saying, Mother's headshaking appeared to be the result of anger and outrage.

\* \* \*

Assessment of Mother's testimony presented the [c]ourt with significant challenges that are not readily apparent from a cold record. Mother had a way of delivering her testimony with a tone and implication that Father was a very bad person without actually saying those words. An example of this arises from Mother's repeated testimony that the [C]hild would have diarrhea upon returning home from visits with Father. Mother never directly said that Father was the cause of the diarrhea, but by the way she presented the testimony[,] she clearly was implying that he was responsible for [C]hild's diarrhea. Nonetheless, no medical testimony was presented on this issue and Mother's reports of

what doctors told her was rank hearsay and is being given no weight by the [c]ourt.

Mother repeatedly found fault in all that Father did. An example of this related to Mother's testimony about FaceTime calls with [C]hild. Mother clearly described [C]hild as crying during FaceTime calls regardless of whose custody she was in at the time. According to Mother, when [C]hild was in Father's custody, [Child] would cry because she desperately wanted to return to Mother. When [C]hild was in Mother's custody and she would FaceTime with Father, she would cry as well. Mother's explanation was less sinister. Nevertheless, the behavior was similar, i.e.[, C]hild occasionally cried during FaceTime calls. The [c]ourt is giving no weight to Mother's interpretation of [C]hild's crying during FaceTime calls.[26]

\* \* \*

Mother's descriptions of her thoughts and actions after being notified by [the physician who examined Child for vaginal itching] that she needed to file a report with [CYS] are concerning. Mother contends that [the doctor] informed her of a doctor's obligation to make a report to [CYS] as a result of an allegation of sexual abuse of [C]hild. According to Mother, she asked [the doctor] to wait to report until she had an opportunity to speak to counsel and because she did not want to hurt Father. When presented with questions about her decision[-]making process, including putting the interests of the alleged abuser ahead of those of [C]hild, Mother quickly changed her testimony. She became very upset and strident, now saying she would never put the interests of another person ahead of the well-being of her child. Notably, she did not change her testimony that she wanted to call her lawyer before a report to [CYS] could be made. This rapid change in testimony by Mother, together with her insistence upon placing a telephone call to her lawyer *before* a call could be made to [CYS], raises serious doubts about the reliability of her testimony and suggests an improper motive for her actions.

_____

[26] The court noted that one of Mother's exhibits (#30), depicting Child crying while on a FaceTime call with Mother while in Father's custody and while he "was laughing and smirking, . . . belie[d] Mother's testimony" that Child was "struggling to get away from Father." *Id.* at 17-18.

This [c]ourt also finds Mother's testimony about the life she lived with Father to be extremely doubtful. Mother is obviously a very assertive person who works as a lobbyist. The [c]ourt finds that she is not the type of person who is easily pushed around. During her testimony, however, she described the life she lived with Father []as completely dominated and controlled by Father. Among the things she said was that Father would prohibit talking, he would only permit the parties to watch Lester Holt on television[,] and would forbid Mother from getting out of bed at night to use the bathroom. And yet, immediately upon separation, Mother became very assertive by controlling Father's custodial time. One need only watch Mother a short period of time to see that [her] description of life with Father was not accurate.

Near the end of her testimony, Mother contended that [C]hild has gone through a great deal over the last several years, purportedly at the hands of Father. As she ultimately admitted, however, she was rarely with Father when he had custody of [C]hild. She then asserted that she was relying on information she received from third[-]party professionals. The irony is that [the] testimony [that] the third[-]party professionals were relying on [is] what Mother had told them. When the third[-]party professionals acted upon the information given to them by Mother, Mother argued it was confirmation of her own views.

Taken in its entirety, with due consideration to other evidence in the case, the [c]ourt found Mother lacking in credibility. **Her lack of credibility poses a long[-]term risk of serious harm to [C]hild.**

Trial Court Decision and Order, 9/19/24, at 16-19 (emphasis added).

To describe this case "a Tale of Two Stories" would be an understatement. Almost everything that one party testified to was completely contradicted by the other. Without a doubt, the parties' inability to see eye-to-eye is negatively impacting the best interest of this young, now-four-year-old Child. The court described the parties level of conflict in this case as "tragic." *See* Trial Court Opinion, 10/16/24, at 54. *See also* N.T. Custody Trial, 9/9/24, at 414 (trial judge stating, parents "are just knocking it out of

the park punishing this child"); *id.* (court admonishing parents, stating, "you both should be ashamed of yourselves. You really should be."); *id.* at 415 (trial judge stating, "These two people can't even agree that they love the child. They dislike each other so much [that] they cannot even recognize that simple agreement they have."). At the conclusion of the two-day custody trial, the court was, justifiably, frustrated and at a loss regarding what final custody arrangement would truly be in Child's best interest. As a result, the court felt compelled to ask the parties' attorneys what they believed was the best solution to this custodial conundrum. *See* N.T. Custody Trial, 9/9/24, at 413-21. The court, in fact, asked at one point, "Why shouldn't I take this child from both parents right now, put her into foster care, and give both parents an occasional opportunity to see her under supervised visitation?" *Id.* at 415; *see also id.* at 419 ("So, again, somebody help me understand how I help this Child [and w]hy I shouldn't pull this child out of this house right now, today, put her in foster care, and give both [M]other and [F]ather supervised visitation once a week.").

When suggested by counsel that the parties engage in co-parenting counseling, the court responded, "What good will that do?" *Id.* at 413. When counsel stated that she thought Child should be enrolled in therapy due to her PTSD diagnosis, the court responded, "[t]h[is] [c]ourt rejected that testimony already." *Id.* at 418. Counsel again stated that she thought Child should see a therapist and further suggested that Father's visits should continue to be supervised until "benchmarks" are achieved. *Id.* at 420. Again, the court

questioned counsel's suggestions. *Id.* at 420-21 (judge telling counsel neither mother nor father can take Child to therapy because they cannot be trusted not to taint therapist's evaluation by talking to therapist); *id.* at 420 (judge stating to counsel, "[b]ut you haven't told me what [the benchmarks] are" when it comes to transitioning from supervised to unsupervised visitation with Father).

Overall, the court found Mother's testimony incredible and her concerns regarding Child's safety while in Father's care **both** unreasonable and untrue, and, in fact, found that her claims bordered on malicious. *See id.* at 417. Under these circumstances, the court did not feel constrained to follow subsection 5328(a)(8), which states that "[a] party's **reasonable** concerns for the safety of the child and the party's **reasonable** efforts to protect the child shall not be considered attempts to turn the child against the other party." 23 Pa.C.S.A. § 5328(a)(8) (emphasis added). We do not doubt that the court's first-hand observations over the course of this custody battle led it to conclude that Mother is controlling, has made it increasingly difficult for Father to co-parent Child, and that there is "evidence [that she had] an intent to turn the Child against her Father." Memorandum Opinion, 10/16/24, at 52. However, if the court truly believed that Mother posed an emotional threat[27] to Child, and that she has "emotionally abused [C]hild in the past, is doing so presently[,] and could do so in the future," Trial Court Decision and Order,

---

[27] In her appellate brief, Mother repeatedly challenges the court's conclusion that she emotionally abused Child. *See* Mother's Brief, at 33, 36, 38-40, 44-45, 59, 64-65, 70-71

9/20/24, at 22, then the proper course might not have been only to increase Father's custodial time, but also order Mother's visitation be supervised—especially where the court seemed to call into question Mother's protective capacity. *See* Trial Court Opinion, 10/16/24, at 46 (court concluding Mother's deliberate, dishonest conduct is not only "fundamentally unreasonable," but that her "intentional effort to interfere with [Father's] custody based upon false pretenses [was] not a reasonable effort to protect [C]hild"); *see* Trial Court Decision and Order, 9/19/24, at 19 (court finding Mother's lack of credibility poses "long term risk of serious harm to [C]hild").

While the trial judge, "in an abundance of caution," entered an interim custody order completely suspending Father's visitation rights—even where it was not convinced that Child was being sexually abused—the court did nothing to monitor Mother's behavior or prevent Mother from continuing to emotionally abuse Child when it crafted its final custody order.[28] Although the court was trying to carefully address its concerns with Mother's behavior while not completely depriving Child visits with Mother, we are unable to conclude that the trial court adequately considered the custody factors, especially, subsections 5328(a)(1), (2), (9), and (10), in coming to its final custody

---

[28] While the parties, by this date, should have attained true 50/50 shared custody under the court's order, we note that the custody order originally gave Mother almost sole physical custody for the first three months (Mother had physical custody of Child exclusively other than for three hours on Wednesdays and nine hours on Sundays) and then the majority of physical custody until the beginning of 2025 (Mother had physical custody of Child exclusively other than for three hours on Wednesdays and on alternating weekends from Friday evenings until Sunday evenings).

decision. Without more, we conclude that the trial court erred when it determined that it was in Child's best interest to grant Mother unsupervised shared physical custody. *See Altland v. Diehl*, 276 A.3d 210, *8 (Pa. Super. 2022) (Table)[29] (trial court ordered "Mother's [] visits be supervised until the trial could be finished . . . because there [was] a potential that after hearing all the testimony . . . it may find emotional abuse by Mother."); *see also id.* at * 22 (court finding emotional abuse by Mother towards Child where Mother "does not understand what the [C]hild goes through when there are [CYF] investigations and [PFA] filings [against Father and his family] and so forth.").

Here, the trial court clearly was concerned about the emotional abuse that Mother seemingly inflicted, was inflicting, or would be inflicting upon Child based on her behaviors. *See* Trial Court Decision and Order, 9/19/24, at 22 (under subsection 5328(a)(1), "[t]he [c]ourt does not believe Mother poses a physical threat of harm to [Child]. **It is concerned she may pose an emotional threat to** [] **Child**.") (emphasis added); *id.* at 22 (under subsection 5328(a)(2), "through her course of conduct, **Mother may have emotionally abused [C]hild in the past, is doing so presently[,] and could do so in the future**.") (emphasis added); *id.* at 29 (under subsection 5328(a)(9), court finds "**Mother's actions . . . are clearly not serving [C]hild's emotional needs**" and "**Mother's conduct will not be adequate for [C]hild's emotional needs**.") (emphasis added); *id.* at 29 (under

---

[29] *See* Pa.R.A.P. 126(b)(2) (non-precedential decisions of Superior Court filed after May 1, 2019 may be cited for persuasive value).

subsection 5328(a)(10), court concluded, "[**w**]**ith the exception of** [**C**]**hild's emotional needs**, both parties can serve the other needs of [Child].") (emphasis added).

While the court weighed the majority of the factors in favor of Father or found them to be neutral as between the parties, the court supported its conclusions with its own first-hand observations at the parties' multiple proceedings over which it presided as well as the copious number of exhibits entered at trial. However, in doing so, the court repeatedly emphasized the fact that it did not find Mother credible and that "through [Mother's] course of conduct, Mother may have emotionally abused [C]hild in the past, is doing so presently, and could do so in the future.". Trial Court Decision and Order, 9/19/24, at 22. The court's custody decision to grant Mother unsupervised shared physical custody is simply not supported by the record. Although we are cognizant that the trial court is tasked with determining the amount of weight that is placed on the evidence, and, concomitantly, solely weighs the section 5328 custody factors, "[as an appellate court,] we are not powerless to rectify an unreasonable custody order" when "the trial court's conclusions are unreasonable as shown by the evidence of record." ***Ketterert***, 902 A.2d at 539. Accordingly, based upon the court's determination that Mother's conduct poses a risk of emotionally abusing Child, we reverse that portion of the court's custody order granting the parties' shared unsupervised physical custody of Child.

Conversely, we believe that the trial court overreached by prohibiting Mother from having **any** legal custody of Child.[30] While the court was understandably focused on preventing Mother from continuing to interfere with Father exercising his periods of physical custody, completely blocking Mother from accessing **any** of Child's medical or educational records online— especially where she has, to date, been the sole parent to handle Child's medical and educational appointments and decisions—is simply unsupported in the record and unreasonable. **See C.R.F.**, **supra** ("We may reject the conclusions of the trial court only if they . . . are unreasonable in light of the sustainable findings of the trial court); **A.D. v. M.A.B.**, 989 A.2d 32, 35-36 (Pa. Super. 2010) ("Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. The appellate court may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.").

Permitting Mother to access Child's online records does not affect Father's sole right to make **legal decisions** on behalf of Child and to be the only parent who is permitted to communicate with Child's school employees and officials, teachers, coaches, principals, tutors, or other educational

_____

[30] To the extent that the court may have thought completely prohibiting Mother from **any** form of legal custody would alleviate its concerns that Mother was emotionally abusing Child, this too seems unsupported in the record. While Mother admittedly wielded the upper hand when it came to scheduling all of Child's appointments and activities and seemingly made the final decisions regarding educational matters, oftentimes without consulting Father, court's decision does nothing to address the emotional impact Mother might have during her unsupervised time with Child.

providers, as well as Child's medical, dental and psychological providers.[31]

**See Altland**, **supra** at *10  (affirming trial court's decision to award sole legal custody regarding decision making to Father and "shared legal custody to both parents for purposes of getting [child's] information,  [] records, medical, dental, educational, counseling and similar records").  Even considering the court's conclusion that Mother's actions are not serving Child's emotional needs, to grant Mother the legal right to access Child's records online will strike a balance that keeps Mother informed of Child's wellbeing while avoiding the court's concern of Mother's manipulative and isolating behaviors. Accordingly, because there is no record evidence to support this portion of the court's decision that "expressly prohibits" Mother from accessing Child's online records, we find it was an abuse of discretion.  **M.A.T.**, **supra**.

Mother also challenges the trial court's decisions with regard to expert testimony.[32]  Mother claims that the court erred in discounting certain expert testimony—specifically that of Dr. Julia Curcio-Alexander and Child's play therapist Moriarty-Puggi—where the court's assessment that Mother had

_____

[31] If Mother has an issue with the information she accesses online, she is not prevented from seeking court intervention.  **See S.W.D. v. S.A.R.**, 96 A.3d 396, 404 (Pa. Super. 2014) (where parties reach impasses in making decisions with regard to legal custody, parties turn to trial court to resolve their impasse).

[32] In her Statement of Questions Involved, Mother contends the court improperly qualified Lauren Mateka as an expert and, thus, incorrectly relied upon her testimony to fashion its custody order.  **See** Mother's Brief, at 12. However, in the Argument section of her brief, Mother withdraws this issue. **See id.**, at 67.

"turned [those experts] against Father and alienated [him] is unsupported by the record." Mother's Brief, at 12.

Mother's challenges regarding witnesses Moriarty-Puggi and Dr. Julia Curcio-Alexander go to their credibility, not whether they were accepted as experts. In fact, the trial court noted this distinction at its July 9, 2024 hearing. *See* N.T. Hearing, 7/9/24, at 8. The court specifically found that Moriarty-Puggi could testify as an expert in the field of child psychology but also noted that her failure to meet with Father "would go to the credibility of her opinion." *Id.*; *see also id.* at 9 (court stating, qualifying witness as expert and permitting her to testify in form of opinion or conclusion "does not mean that the [c]ourt has made a determination that they are factually an expert, nor does it mean that the [c]ourt has made any determination on what weight it will give to the testimony."). As we have previously stated, we grant great deference to the credibility determinations of the trial court, especially where the trial judge has observed these witnesses multiple times and has been able to make first-hand judgments regarding their demeanor and believability. Thus, we find no error.

Finally, Mother asserts that the trial court displayed bias against her by issuing an order that is manifestly unreasonable, unnecessarily punitive, and beyond the relief requested. Specifically, she alleges that the court exhibited bias against her at trial and in its final custody order and that the order "exceeds the relief Father requested." Mother's Brief, at 71.

First, we note that, in a custody matter, the court must always ground its ultimate decision on the best interest of the Child. **See E.R. v. J..N.B.**, 129 A.3d 521, 527 (Pa. Super. 2015) ("When a trial court orders a form of custody, the best interest of the child is paramount."). Thus, it is of no moment that Father may not have requested the relief that was ultimately granted. Moreover, we find no merit to Mother's claim that the court exhibited bias against her. There is no indication in the record that the court did anything but a detailed analysis of relevant custody factors based on the lengthy first-hand observations and evidence adduced at the parties' many proceedings. Although Mother may disagree with the court's custody order, there is nothing to support her claim other than general complaints of bias in the form of leading questions and the court's questioning of Mother "displaying clear inability to render fair judgment." Mother's Brief, at 72.[33]

After a thorough review of the record, we reverse the trial court's order. In particular, we find unreasonable the court's decision in regard to: (1) Mother's shared physical custody arrangement and (2) that portion of the legal custody arrangement "**EXPRESSLY PROHIBITING**" Mother from accessing any electronic portal for the purposes of viewing: (a) "educational records of [] Child[;]" and (b) "medical, dental, or psychological records of [C]hild." Final

_____

[33] In fact, in light of this Court's finding that the trial court's determination Mother emotionally abused Child and that the court's final custody order did not reasonably reflect this overarching concern, this claim is inherently meritless.

Custody Order, 9/19/24, at 2.[34] To give Mother access to Child's educational or medical records through a computer portal, without permitting her to interact or intervene personally in those matters without Father's consent, is a rational and reasonable decision that does not infringe upon or interfere with Father's custodial time or decision-making ability as it relates to Child and does not put Child at further risk of Mother's emotional abuse. **See** Trial Court Decision and Order, 9/19/24, at 32 (court noting that "removing a Father from a four[-]year[-]old child's life could also prove to be devastating."). Thus, we remand the matter to the trial court to address these specific matters in light of the evidence presented, in particular, with an emphasis on the trial court's credibility determinations that Mother's course of conduct throughout this custody battle has been and continues to be emotionally abusive to Child.

Order reversed. Case remanded with instructions. Jurisdiction relinquished.[35]

---

[34] In coming to our determination today, we recognize that the portions of the custody order preventing Mother from directly communicating with school officials or listening in on conversations or conferences that Father may have with Child's school officials, without Father's consent, as well as preventing her from communicating directly with Child's medical, dental, and psychological providers or scheduling appointments with those providers, **is** warranted under the circumstances of this case. However, because custody determinations are grounded in the best interest of the child, they are also fluid and always subject to modification.

[35] We deny Father's request for counsel fees as we have determined that Mother's appeal is neither frivolous nor taken solely for purposes of delay. **See** Pa.R.A.P. 2744.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


Date: <u>05/02/2025</u>